SECOND DIVISION

OCTOBER 22, 2002

No. 
1-00-3242

THE PEOPLE OF THE STATE OF ILLINOIS
, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County
.

) 

)

v.     ) 99 CR 3770

)

                     ) 

JUDSON MANNING,
 ) The Honorable

) Stanley J. Sacks,   

Defendant-Appellant.
 ) Judge Presiding.

                 

JUSTICE CERDA delivered the opinion of the court:

On appeal, defendant, Judson Manning,
 contends that the State failed to prove him guilty of child abduction beyond a reasonable doubt, that the trial court erred in refusing to define the word “conceal” for the jury, and that he was rendered ineffective assistance of counsel.

Following a jury trial, defendant was found guilty of child abduction (720 ILCS 5/10-5(b)(6) (West 2000)) and sentenced to 20 months in prison.
  We affirm.

 BACKGROUND

During opening arguments, defense counsel told the jury defendant would testify that he was concerned his wife was mistreating their child.  Because of this mistreatment and defendant’s concern for the child’s “future well being,” defendant decided the child should not see her mother.  The defense provided no evidence at trial of any mistreatment by defendant’s wife and defendant informed the court he did not wish to testify.

At trial, Olga Manning testified with the assistance of a translator.  She stated she was married to defendant 
in December 1998,
 and they had a two-year-old daughter, T.M.  Olga admitted that her marriage to defendant was troubled and the couple was considering separating.  On the morning of December 23, 1998, Olga took T.M. to the babysitter and went to work.  Defendant called her and said he would pick up T.M. and would help Olga fix her car after work.  Around 4 p.m., Olga received a telephone call from the babysitter requesting permission to let T.M. leave with defendant.  Olga told the babysitter that defendant had permission to pick up T.M.

After work, Olga waited for three hours, but defendant did not arrive.  When she went home, defendant and the child were not in the apartment.  Olga testified the apartment was in disarray and T.M.’s clothes, the stove, the refrigerator, and Olga’s and T.M.’s passports were missing.  Olga called the police.

Olga stated that she, defendant and T.M. had planned to spend Christmas in Iowa with defendant’s mother, Trena Manning.  Olga called Trena, who told her not to worry, defendant “was just buying some things.”  When Olga again called Trena on December 25, 1998, someone picked up the telephone, then hung up on her.  Ten minutes later, Trena called Olga and told her never to call her home again.

Olga testified she went to Iowa twice to look for her daughter – once on December 28, 1998, and again on December 31, 1998.  On December 28, 1998, Olga went to the police station and to Trena’s home.  T.M. was not at Trena’s home, but Olga saw that the child’s clothes were there.  Trena did not give Olga a telephone number or an address where T.M. could be reached.  When Olga returned to Iowa on December 31, 1998, she contacted Ethel Pierangelli, a friend of Trena’s.  

Trena Manning testified that defendant, Olga and T.M. were to spend Christmas at her house in Iowa.  Because Olga and defendant were having marital problems, Trena arranged for defendant to stay at her friend Ethel’s home, while Olga and T.M. stayed with her.  However, defendant and T.M. arrived at her house without Olga on December 24, 1998.

Trena testified that Olga called her on December 25, 1998, but she did not tell Olga her husband and child were there because she hoped to convince defendant to return to Chicago and resolve his marital problems.  Trena further testified that Olga and two of her friends, Yolanda and Hector, arrived at Trena’s house on December 26, 1998.  When Olga asked Trena where T.M. was, Trena responded that defendant had taken the child to McDonald’s and would be back shortly.  According to Trena, Olga threw herself on the floor and screamed, “what do these people want from me” and “my baby.”  She then began pulling out her hair.  Yolanda and Ethel attempted to comfort Olga.  Trena stated she was distraught and went to her room.

After Olga calmed down, Trena and Olga spoke in Trena’s room.  Olga told Trena that Hector and Yolanda had driven her to Iowa and they had to go back to Chicago because Yolanda was starting a new job that evening.  Trena testified that Olga and her friends departed approximately one hour before defendant and T.M. returned to the house.

Trena stated that she received a telephone call from a police officer at some point, inquiring about defendant and T.M.  She did not tell the officer defendant and T.M. were staying with her because she assumed the officer knew they were there.

Trena saw Olga again on January 2, 1999, at Ethel’s home.  Trena testified she was very upset and did not remember what she and Olga said to each other.  The next day, Ethel went to her home and discovered that defendant and T.M. had left.

Ethel Pierangelli testified that Olga went to Trena’s apartment on December 26, 1998, and asked where her baby was.  Olga then threw herself on the floor and pulled at her own hair until Ethel and Yolanda calmed her down.  Ethel stated that she and Olga were close friends and that Olga called her after she returned to Chicago to ask “is little [T.M.] all right or something like that.”  Ethel also stated that she “probably” called Olga in Chicago other times to tell her how T.M. was.

On the night of January 1, 1999, Olga, Yolanda and Hector returned to Iowa and went to Ethel’s house.  Ethel took them to a motel for the night.  The next day they moved to a vacant apartment in one of the buildings Ethel managed.

Ethel testified that on January 2, 1999, she went to Trena’s home to wish Trena a happy birthday.  Because Trena and defendant were arguing, Trena went to stay with Ethel.  Ethel returned to Trena’s the next day to get Trena’s medication and discovered that defendant and T.M. were gone.  Olga, Yolanda and Hector left Iowa on January 4, 1999.

At 11 p.m. on January 10, 1999, defendant was apprehended in Hidalgo, Texas, while attempting to cross the border from Mexico into the United States.  Olga was reunited with T.M. on January 11, 1999, in Texas.  Defendant had never contacted Olga during their absence.

During deliberations, the jury sent a note to the trial judge asking, “Is there a legal definition of the word ‘concealed.’  If so what is it.”  The court responded, “There is no legal definition for the word ‘concealed.’  However, please use your own observations and experience in life and review the instruction which begins ‘to sustain the charge of child abduction the State must prove the following propositions ***.’” Defense counsel objected to the response, arguing that the judge should only tell the jury there is no legal definition of the word “concealed” and nothing more.

The jury deliberated for approximately another 1½ hours.  Deliberations lasted a total of under three hours.  Defendant was found guilty of child abduction and sentenced to 20 months in prison.  

On appeal, defendant contends that the State did not prove he concealed T.M., the trial court erred in refusing to define the word “concealed” for the jury, and his trial counsel was ineffective for not delivering promised testimony.

ANALYSIS 

Defendant first contends that the State failed to prove him guilty of child abduction beyond a reasonable doubt.  He argues that the evidence was insufficient to show he intentionally or knowingly concealed T.M. from her mother for 15 days because Olga knew the child was at Trena’s house until January 3, 1999.  The State argues that Olga’s knowledge does not preclude defendant’s conviction because defendant intentionally kept the child away from her mother.

Where a defendant challenges the sufficiency of the evidence, a reviewing court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Taylor
, 186 Ill. 2d 439, 445, 712 N.E.2d 326 (1999).  A conviction will not be set aside unless the evidence is so improbable or insufficient that there remains a reasonable doubt as to the defendant's guilt.  
Taylor
, 186 Ill. 2d at 445.

A person is guilty of child abduction when he:

"[b]eing a parent of the child, and where the parents of such child are or have been married and there has been no court order of custody, conceals the child for 15 days, and fails to make reasonable attempts within the 15 day period to notify the other parent as to the specific whereabouts of the child, including a means by which to contact such child, or to arrange reasonable visitation or contact with the child.”  720 ILCS 5/10-5(b)(6) (West 2000).

Defendant does not deny that he was T.M.’s parent, he was married to Olga at the time of the incident, and he failed to make any attempt to contact Olga regarding T.M.’s whereabouts.  He does argue, 
however,
 that the State did not prove he concealed T.M. because Olga knew T.M. was at Trena’s home in Iowa.  We disagree.

There was no evidence presented at trial showing that Olga definitively knew where T.M. was staying.  Despite her efforts to locate the child, Olga never saw or spoke to T.M.  Even if Trena and Ethel did tell Olga the child was in Iowa, Olga may not have believed them due to their relationships with defendant. Furthermore, defendant could have been moving T.M. to different locations.  Regardless of where the child’s clothes were stored, Olga could not have been sure where T.M. herself was living and sleeping.  She had no assurance of the child’s whereabouts without having actual contact with her.

In addition, we find it would be inappropriate to judge defendant’s guilt by looking to Olga’s knowledge.  Olga’s knowledge is not an element of the offense and the State was not required to prove a lack of knowledge on her part.  In determining whether a defendant committed a criminal act, the focus must be on the defendant’s state of mind.  The child abduction statute and 
accompanying jury instructions require the jury to find that defendant intentionally or knowingly concealed T.M. from her mother.  See 720 ILCS 5/10-5(b)(6) (West 2000); Illinois Pattern Jury Instructions, Criminal, No. 8.11 (4th Ed. 2000).
  They do not require the jury to consider the mother’s knowledge, resulting from her efforts to find the child.

Although the child abduction statute does not provide a legal definition of the word “conceal,” the courts look to the plain language of the statute to ascertain the legislature's intent.  
Burnett v. Safeco Insurance Co. of Illinois
, 227 Ill. App. 3d 167, 173, 590 N.E.2d 1032 (1992).  Language is to be given its ordinary and popularly understood meaning.  
Roser v. Anderson
, 222 Ill. App. 3d 1071, 1075, 584 N.E.2d 865 (1991).  The common definition of the word “conceal” is “[t]o hide or keep from observation, discovery, or understanding; keep secret.”  American Heritage Dictionary 304 (1985).

The trial testimony established that defendant took T.M. to Iowa on December 23, 1998, without first notifying Olga.  In fact, defendant told Olga he would help her with her car after work.  Instead, he left the state with T.M.  Defendant took all of T.M.’s clothes and her passport, indicating an intention to leave the country.  Defendant did not contact Olga while he was in Iowa to tell her where T.M. was or how she was doing.  There was no testimony as to whether defendant knew Ethel and Trena had spoken to Olga or given her information about T.M.’s whereabouts and well being.  Subsequently, on January 3 or 4, 1999, defendant left his mother’s home with T.M.  No testimony was offered regarding defendant’s and T.M.’s whereabouts until they were apprehended at the United States-Mexico border on January 11, 1999.

Given the witnesses’ testimony, the jury 
reasonably
 could have inferred that defendant intended to hide T.M. and keep her from her mother’s observation.  As a result, there was sufficient evidence to find him guilty of child abduction beyond a reasonable doubt.  See 
People v. Rodriguez
, 312 Ill. App. 3d 920, 932, 728 N.E.2d 695 (2000) (it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn therefrom).

We also note that defendant’s conviction was consistent with the intent of the child abduction statute.  In construing a statute, the court should consider the reason for the law, the evil to be remedied, and the purpose to be obtained thereby.  
Roser
, 222 Ill. App. 3d at 1075.  Many states have enacted child abduction statutes to prevent the unlawful seizure of a child by a parent who does not have a right to exclusive custody of the child and to protect the child from the emotional effects of abduction.  
See 
People v. Harrison
, 82 Ill. App. 3d 530, 532, 402 N.E.2d 822 (1980)
; Minn. Stat. Ann. §609.26 (West 2000) (amended by Minn. Law S 2002, ch. 379, art. 1, §105) (it is a felony to “conceal[] a minor child from the child's parent where the action manifests an intent substantially to deprive that parent of parental rights”); Wis. Stat. Ann. 
§
948.31 (West 2000) (amended by Wis. Act 109, 
§
919) (it is a felony for any parent to intentionally conceal a child from the child's other parent); 
Strother v. State
, 891 P.2d 214, 221 (Alaska App. 1995); 
State v. Todd
, 509 A.2d 1112, 1115-16 (Del. Super. 1986) (“a parent, absent any valid custody order to the contrary, has no legal right to take a child into his or her own exclusive physical *** custody to the exclusion of the other parent's lawful custodial rights”); see also Oversight Hearing on the Parental Kidnaping Prevention Act of 1980 Before the Subcomm. on Crime of the House Comm. on the Judiciary, 97th Cong., 1st Sess. 1 (1981) (statement of Representative William J. Hughes, chairman:  "Child snatching is one of the most serious and damaging forms of child abuse that exists. The severity of the trauma of child snatching is one of the few points that behavioral scientists agree upon, almost without exception").  The abduction statutes focus on the defendant's actions, the effect of the defendant's actions, and the intent with which those actions were performed.  
Strother
, 891 P.2d at 221.

 In this case, the record shows that defendant took T.M. to Iowa without telling his wife that they were leaving or what their destination was.  Defendant subsequently took T.M. to Mexico, where they were apprehended attempting to cross the border into the United States in the middle of the night.  Defendant never contacted Olga the entire 19 days he was gone with T.M.  Even though Olga may have heard from other sources that T.M. was at Trena’s house, defendant’s actions clearly show that he intended to deprive Olga of her parental rights to the child.  The effect of those actions was Olga’s inability to see or communicate with T.M. for 19 days.  Further, defendant’s behavior in absconding with the child demonstrates that he knew he had no right to take T.M. out of Illinois, and that he intended to keep T.M. away from her mother.

In conclusion, whether defendant intentionally concealed T.M. was a factual issue to be determined by the jury.  Given the testimony presented at trial, a reasonable jury could have found defendant guilty of child abduction beyond a reasonable doubt.  
People v. Azizarab
, 317 Ill. App. 3d 995, 999, 740 N.E.2d 1142 (2000) (the jury weighs the evidence and determines the credibility of the witnesses).  Furthermore, the jury’s finding of guilt was consistent with the common definition of the word “conceal,” as well as with the intent of the child abduction statute.

Defendant next contends that the trial court erred in not providing the jury with a definition of the word “conceal.”   A trial court's decision whether to answer a question from the jury will not be disturbed absent an abuse of discretion.  
People v. Landwer
, 279 Ill. App. 3d 306, 314, 664 N.E.2d 677 (1996).  The court may properly decline to answer a jury's question where the instructions are readily understandable and sufficiently explain the law, where further instructions would serve no useful purpose or could mislead the jury, when the jury's inquiry involves a question of fact, or if the answer would cause the court to express an opinion that might direct a verdict one way or another.  
People v. Childs
, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534 (1994).

When words used in a jury instruction have a commonly understood meaning, the court need not define them with the use of additional instructions; this is particularly true where the pattern jury instructions do not provide that an additional definition is necessary.  
People v. Washington
, 184 Ill. App. 3d 703, 708, 540 N.E.2d 1014 (1989); 
People v. Powell
, 159 Ill. App. 3d 1005, 1015, 512 N.E.2d 1364 (1987).  Jurors are entitled, however, to have their inquiries answered.  
Childs
, 159 Ill. 2d at 228-29.  Generally, the trial court must instruct the jury if the jury has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion.   
Childs
, 159 Ill. 2d at 228-29.

In this case, the court did not decline to answer the jury’s question as defendant contends.  The court responded to the specific inquiry and responded correctly.  The jury asked, “Is there a legal definition of the word ‘concealed.’  If so, what is it.”  The court responded, “There is no legal definition for the word ‘concealed.’  However, please use your own observations and experience in life and review the instruction, which begins ‘to sustain the charge of child abduction the State must prove the following propositions ***.’”
  The jurors asked 
only 
for a legal definition of the word.  They did not ask for the common definition or for a dictionary.  In addition, the court was correct that 
there was no legal definition of the word “concealed.”  
Contra
 
People v. Brouder
, 168 Ill. App. 3d 938, 523 N.E.2d 100 (1988) (trial court refused to use defendant’s proposed pattern jury instruction defining the word “knowingly” after jury exhibited confusion about the term).

Defendant cites to the cases of 
People v. Comage
, 303 Ill. App. 3d 269, 709 N.E.2d 244 (1999), and 
People v. Landwer
, 279 Ill. App. 3d 306, 664 N.E.2d 677 (1996), in support of the proposition that the court was presented with a legal question and had a duty to clarify the meaning of the word “concealed.”  However, these cases are distinguishable from the instant cause of action.  We initially note that in 
Comage
 and 
Landwer
, the trial courts refused to answer the juries’ questions.  Whereas here, the court did respond to the jury’s specific question.

Furthermore, in 
Comage
, the Fourth District Appellate Court found that the trial court erred when it refused to answer the jury’s request for a definition of the term “knowingly.”  The court stated that the definition was an issue of law, on which the jury should have been instructed at its request.  
Comage
, 303 Ill. App. 3d at 274.  In that case, however, the Illinois Pattern Jury Instructions contained a legal definition of the word “knowingly,” and the defendant tendered the instruction following the jury’s question.  S
ee Illinois Pattern Jury Instructions, Criminal, No. 5.01B(1) (3d ed. 1992)
.  In this case, the pattern jury instructions did not provide an additional definition for the word at issue, no legal definition of the word could be found, and defendant did not tender a proposed instruction.  
Landwer
, 279 Ill. App. 3d at 313-14;  
People v. McClendon
, 197 Ill. App. 3d 472, 479, 554 N.E.2d 791 (1990) (a party may not raise on appeal the failure to give an instruction, unless he tendered the instruction at trial). 
 In fact, defense counsel in this case objected to the court providing any response at all other than telling the jury there was no legal definition on the word “concealed.”

In 
Landwer
, the trial court refused the jury’s request for a definition of the word “originated.”  The jury subsequently requested a dictionary.  When the court asked why the jury wanted a dictionary, they responded that they wanted to look up the word “originate.”  The court refused to send the jury a dictionary.  On review, the Second District Appellate Court
 determined that the jury’s request was a question of law and that the court was obligated to address its confusion.  The court stated that the jury was clearly confused as it asked for the definition of “originate” three times and requested a dictionary.  
Landwer
, 
279 Ill. App. 3d
 at 315.  
The jurors in this case, however,
 did not indicate that they were unfamiliar with the common definition, that they were confused, or that they were deadlocked over the meaning of the term.
  See 
e.g.
, 
People v. Waldron
, 219 Ill. App. 3d 1017, 1041, 580 N.E.2d 549 (1991).
  They only asked if there was a legal definition of the word “concealed.”  They did not ask for the common definition, nor did they ask for a dictionary.  After their question was answered, they deliberated for less than 1½ hours before finding defendant guilty.

Finally, we note that further instructions in this case would have served no useful purpose.  See 
Childs
, 159 Ill. 2d at 228-29
 (the court may properly decline to answer a jury’s question where further instructions would serve no useful purpose).  As was previously stated, the common definition of the word “conceal” is 
“[t]o hide or keep from observation, discovery, or understanding; keep secret.”  American Heritage Dictionary 304 (1985).
  We fail to see how this definition could have assisted the jury or given them any insight into whether T.M. was concealed.  There is no discernable difference in determining whether the child was concealed, hidden or kept secret.  Therefore, any error in the trial court’s response would have been harmless.  See 
People v. McDonald
, 168 Ill. 2d 420, 460-61, 660 N.E.2d 832 (1995) (where defendant suffered no prejudice the
 alleged error was harmless).

Finally, defendant contends he was denied effective assistance of counsel due to defense counsel’s failure to present promised testimony.  
Defense counsel stated during opening arguments that defendant would testify he took T.M. to Iowa because Olga was mistreating her.  Defendant later informed the trial court that he did not wish to testify.  He now argues that counsel’s failure to provide the promised testimony “destroyed” his credibility and resulted in ineffective assistance of counsel.  We disagree.

To support a claim of ineffective assistance of counsel, a defendant must allege facts demonstrating his counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); 
People v. Albanese
, 104 Ill. 2d 504, 525, 473 N.E.2d 1246 (1984).  A defendant must satisfy both prongs of the 
Strickland
 test and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel.  
People v. Patterson
, 192 Ill. 2d 93, 107, 735 N.E.2d 616 (2000).  In considering whether defense counsel was ineffective, there is a strong presumption that counsel's actions were the result of sound trial strategy.  
People v. Coleman
, 183 Ill. 2d 366, 397, 701 N.E.2d 1063 (1998).

A counsel’s failure to provide promised testimony is not ineffective assistance 
per se
.  
People v. Schlager
, 247 Ill. App. 3d 921, 932, 617 N.E.2d 1275 (1993) (“the test is not whether defense counsel fulfilled all the promises he made during his opening remarks but, rather, whether defense counsel's errors were so serious that, absent those errors, the result of the proceeding would likely have been different”); 
Howard v. Davis
, 815 F.2d 1429, 1433 (11th Cir. 1987) 
(defense counsel’s decision to abandon insanity defense did not amount to ineffective assistance).
  Defendant must show that his counsel’s decisions were unreasonable and that there was a reasonable probability his errors effected the outcome of the proceeding.  
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2052.

Defendant has provided this court with no evidence that counsel’s failure to provide the promised testimony rendered his assistance ineffective.  Defendant does not allege that counsel advised him not to testify or that counsel made the opening remark without first asking whether he wished to testify.  Defendant could have informed his attorney prior to trial that he wished to testify and subsequently changed his mind.  If this were the case, the failure to present defendant’s testimony would not have been due to counsel’s incompetence.  We cannot determine from the record presented whether counsel’s decision to abandon the defense of necessity was due to defendant’s choice not to testify, sound trial strategy or incompetence. 
 
Anderson
, 858 F.2d at 19 (abandoning a defense can be a plausible strategic move
); see also 
Howard v. Davis
, 815 F.2d 1429, 1433 (11th Cir. 1987) 
(defense counsel’s decision to abandon insanity defense did not amount to ineffective assistance).
  Therefore, we must presume it was the result of trial strategy.  See 
Coleman
, 183 Ill. 2d at 397.

Defendant cites 
People v. Lewis
, 240 Ill. App. 3d 463, 609 N.E.2d 673 (1992), and 
 
Anderson v. Bulter
, 858 F.2d 16 (1st Cir. 1988),
 in support of his ineffective assistance argument.  However, in those cases the courts were able to determine whether the attorneys were incompetent from the record before them.

In 
Lewis
, this court determined that counsel was incompetent for promising, 
during opening argument
, to produce the defendant’s pretrial exonerating statement when the state
ment was actually inadmissible hearsay.  
Lewis
, 240 Ill. App. 3d at 468.  
 Clearly
, trial counsel’s error in offering to introduce an inadmissible statement was apparent from the record and could not have been attributed to anything other than counsel’s incompetence.  In this case
, counsel’s motivation for not presenting defendant’s testimony cannot be determined from the record
.
  
The decision could have been the result of trial strategy or defendant’s last-minute decision not to testify.

In 
Anderson
, defense counsel was deemed ineffective for failing to present promised expert testimony showing that defendant was mentally impaired at the time of the crime.  The
 
Anderson
 court specifically noted that the expert witnesses were available to testify and would have testified in support of defendant’s insanity defense as promised.  
Anderson
, 858 F.2d at 19.  In contrast
, there is no evidence here that defendant was ready and willing to testify or that he would have testified that his wife m
i
streated the child.

In sum, this court was not privy to discussions between defendant and his counsel, nor is it clear from the record why defendant did not testify or whether he ever intended to testify.  Because these matters are outside the record, they cannot be addressed on direct appeal.  
People v. Woolley
, 178 Ill. 2d 175, 204, 687 N.E.2d 979 (1997)
; 
People v. Crockett
, 314 Ill. App. 3d 389, 405, 731 N.E.2d 823 (2000) (defendant bears the burden of preparing a proper record and preserving that record)
.
 

For these reasons, the judgment of the trial court is affirmed.

Affirmed.

McBRIDE, P.J., and CAHILL, J., concur.