2018 IL App (1st) 161226

FIRST DIVISION
November 13, 2018

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-16-1226

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 17189 |
| | ) | |
| CLAUDE CROWDER, | ) | Honorable |
| | ) | Mary Colleen Roberts, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Pierce and Griffin concurred in the judgment and opinion.

**OPINION**

¶ 1   Defendant, Claude Crowder (Claude or Mr. Crowder), was convicted of aggravated unlawful use of a weapon (AUUW) after a bench trial and was sentenced to one year of imprisonment. Claude's felony conviction was based on his brief possession of a handgun legally possessed by his father, Sammie, during an altercation started by others. On appeal, Claude argues we should reverse his conviction because his possession of the handgun was necessary for him to defend himself and his father after three men—one of whom appeared to be reaching for a "bulge" that Claude believed was a weapon—attacked them without provocation. Claude also argues, and the State concedes, that we should correct the mittimus to reflect that he did not use a handgun while in a vehicle. However, it is not necessary for us to reach that issue since we reverse Claude's conviction.

¶ 2                                 I. BACKGROUND

¶ 3      Claude was charged with one count of reckless discharge of a firearm and six counts of AUUW. In his August 4, 2015, answer to discovery, Claude stated that he would "rely on the State's inability to prove his guilt beyond a reasonable doubt" and "assert the defense of defense of others: to wit, his father, Sammie Crowder." Claude waived his right to a jury trial, and the State proceeded to a bench trial on all seven counts.

¶ 4      At the September 24, 2015, bench trial, Sammie Crowder and Chicago police officer Damen Balesteri testified in the State's case-in-chief, and Claude testified in his own defense.

¶ 5      The witnesses testified that, on the night of September 16, 2014, Sammie, who was 73 years old, and Claude, who was 28 years old, drove to the home of Claude's wife, Pearlina, with whom Claude had a strained relationship. They drove there to pick up Claude's young daughter and some clothes for Claude's aunt's funeral, which they planned to attend the next day.

¶ 6      Sammie and Claude arrived at the home around 10 p.m. Claude went to the front door while Sammie waited in the car. Claude knocked at both the door and the front window several times and received no answer, although the lights were on and several people could be seen in the living room. Sammie testified that, "because of previous incidents," he got out of the car to convince his son that they should leave—they could buy clothes and leave for the funeral later. At that time, Sammie was lawfully carrying a loaded, .380-caliber Glock handgun in a holster on his right hip, for which he had a valid firearm owner's identification (FOID) card and a concealed carry license (CCL).

¶ 7      Both Sammie and Claude were on the front porch and were about to leave when the door opened and three men appeared in the doorway. On the left was Louis Woods and on the right was Andrew Jackson—both brothers of Claude's wife, Pearlina. Claude testified that he knew

the man in the middle only by the street name of "Ra-Ra." Claude testified that Louis was roughly six-and-a-half feet tall and that Andrew was of average height and build. According to Sammie, Ra-Ra was "huge *** over 400 [pounds]." The witnesses agreed that, with no provocation and no words exchanged, Louis swung his fist at Claude. According to Sammie, Louis's fist immediately hit Sammie on his upper shoulder, causing him to fall backward, lose his balance, fall off the left side of the porch, which did not have a railing, and hit the ground five feet below. Claude testified that Louis's fist connected with him in the jaw before it struck Sammie's shoulder and caused him to fall off the porch.

¶ 8    Claude testified that that there were rocks on the ground under the porch and he "didn't know if [his father] had hit his head on one of those rocks and knocked himself unconscious." He ran down to check on his father, who appeared to be injured, and called his name multiple times. His father "moved a little bit," and Claude tried to lift him but could not. Claude heard the men above yelling threats and obscenities at him, and he saw Ra-Ra reach for a bulge under his shirt that Claude believed was a weapon. Claude testified that, as he stood over his father, the threats and yelling increased, and that he heard one of the three men yell "I will empty the caps in his a**." Claude then grabbed his father's handgun from its holster and fired one shot vertically into the air. He testified that he did this "for protection for me and my father." Claude then backed away from the porch, holding the gun up in the air, thinking he would thereby draw the men away from his father. He did not fire again but turned and ran down the street, without looking behind him. The parties agreed that the time between when Claude left the porch and when he was stopped by the police was only a matter of minutes.

¶ 9    Claude testified that, although he did not see Louis with a weapon that night, he "kn[e]w Louis well enough to know that he may have had or does have a weapon," and that he had seen

3

Ra-Ra with a weapon in the past. He acknowledged on cross-examination that Ra-Ra never pulled a weapon from under his shirt and that he did not tell the officers on the scene about the bulge. He claimed that he did tell this to Officer Balesteri later at the station.

¶ 10    Officer Balesteri testified that he was on duty in the area when he received a call at 10:22 p.m. of a man with a gun, and that the person who called gave the officer an IR (incident report) number, which allowed the officer to pull up a picture of Claude on the portable computer in his police vehicle. The officer found Claude roughly a block from the scene of the altercation, conducted a protective pat-down of him, and discovered the handgun. Claude told Officer Balesteri that he had manually ejected bullets from the handgun and guided the officer to the ejected bullets. The officer testified that there were two rounds remaining in the handgun, and that he recovered two intact ejected bullets from where Claude pointed them out, along with one spent shell casing at the scene of the altercation. Officer Balesteri testified that Claude had no FOID card or CCL on him that night. Officer Balesteri testified that, after he was placed under arrest and read his *Miranda* rights, Claude told Officer Balesteri that "he shot the gun off because he was pissed off." At trial, Claude acknowledged telling this to the officer, but explained that he "didn't mean it in the sense where [he was] just a reckless person," but rather that he was "pissed off to the fact that they had hurt [his father]."

¶ 11    Officer Balesteri testified that he and other police officers took statements from various witnesses the night of the altercation. Sammie's statement the night of the incident differed from his trial testimony only to the extent that, in his statement, he told the police that someone pushed his son who then fell against him, rather than, as he testified at trial, that he was hit directly. Claude's testimony was consistent with his statement to the police the night of the incident except that, according to Officer Balesteri, he did not tell the police about the bulge in

Ra-Ra's shirt.

¶ 12    The State admitted into evidence a certification from the Illinois State Police Department, stating that, as of November 12, 2014, an individual named Claude Crowder with a birth date of May 29, 1986, did not have a FOID card or CCL.

¶ 13    Defense counsel argued in closing that the parties agreed on most of the facts: that Claude fired the gun once, walked away in order to "deflect the violence that's going on with the people on the porch away from his father," then started to take the remaining bullets out of the handgun. Counsel asked the trial court "to find that the actions of Claude Crowder were allowable *** in the situation and under the law." The State responded that it had proved every element of both reckless discharge and AUUW, and that there was no imminent threat to Claude or Sammie to justify Claude's unlawful possession of his father's handgun.

¶ 14    The trial court found Claude not guilty of reckless discharge of a firearm, concluding that Claude "shot that firearm in the air intentionally," that he did not shoot it "in anyone's direction nor did he shoot it recklessly," and therefore that Claude "did not endanger the bodily safety" of anyone. However, the trial court found Claude guilty on all six counts of AUUW predicated on his unauthorized possession of the handgun. The trial court's entire ruling on this issue was as follows:

> "I find the evidence has been uncontroverted. The defendant had a gun on him. He carried it on his person. And so the State has met each and every element of each and every one of those offenses. So I find the defendant guilty beyond a reasonable doubt."

¶ 15    In his written motion for reconsideration, Claude argued that he "did not plan for any violence, or any use of a weapon," nor did he even bring a gun with him on the night of the

altercation. Rather, he "only defended his father by shooting the gun in the air, and took it away from the violent situation." Claude argued that he was acquitted of reckless discharge and only remained in illegal possession of the weapon "for a matter of a couple of minutes, at most," during which he was unloading the handgun before fully cooperating with police to locate the ejected bullets and submit to arrest. Under these circumstances, Claude argued, he should not have been found guilty of AUUW for possessing a firearm without a FOID card.

¶ 16    On January 20, 2016, the trial court heard argument on Claude's motion to reconsider his guilty verdict and his motion for a new trial. Defense counsel argued that this was "something that was a spontaneous event [after which Claude] took himself away from the situation" and "[n]ever endangered anyone at the scene." The State responded that Claude "did assert defense of another," but that "you can't bring a gun to a fist fight," that he did not have a FOID card, and that "there is no necessity because he had no right *** he could have punched him [and] that would have been a defense of another person." In reply, counsel for Claude argued he was protecting his father in an emergency, and "it was a necessity that—even [to] have it in his hand." The trial court denied Claude's motion to reconsider and his motion for a new trial, without comment.

¶ 17    On March 30, 2016, the trial court merged Claude's AUUW charges into a single count and sentenced Claude, who had no felony background, to the minimum sentence, which was one year of incarceration, with credit for 188 days he had spent on electronic monitoring.

¶ 18                                    II. JURISDICTION

¶ 19    Claude was sentenced on March 30, 2016, and filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from final judgments of conviction in

criminal cases. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 20                                    III. ANALYSIS

¶ 21    Claude was convicted of AUUW under section 24-1.6(a) of the Criminal Code of 2012, in that (1) he knowingly carried or concealed on his person an uncased and loaded pistol; (2) at a time when he was not on his own land, in his own abode, or in a fixed place of business, or he was on public land; (3) that pistol was immediately accessible to him at the time he carried it; and (4) he did not have a FOID card or CCL. 720 ILCS 5/24-1.6(a)(1), (a)(3)(C); (a)(2), (a)(3)(A), (a)(3)(C), (a)(3)(A-5) (West 2014). The burden of proving the defendant's guilt beyond a reasonable doubt always rests on the State (*People v. Abadia*, 328 Ill. App. 3d 669, 679 (2001)), and once an affirmative defense has been raised, the State has the burden of proving the defendant guilty beyond a reasonable doubt as to that issue (*People v. Guja*, 2016 IL App (1st) 140046, ¶ 46).

¶ 22    Claude argues that the evidence at trial was insufficient to support a conviction for AUUW, based on possessing a weapon without a FOID card, because the evidence demonstrated that, under the circumstances, it was necessary for him to possess the firearm in question to adequately defend himself and his father. When considering the sufficiency of the evidence, the relevant question on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 23    To properly raise an affirmative defense, a defendant is required to present some evidence on the issue, unless the State's evidence itself raises the defense. *People v. Kite*, 153 Ill. 2d 40, 44-45 (1992). "Generally, the quantum of proof necessary to raise an affirmative defense

is evidence sufficient to raise a reasonable doubt as to defendant's guilt or innocence," which is a relatively low threshold. (Internal quotation marks omitted.) *Id.* at 44.

¶ 24    Use of force in self defense or defense of another includes the following elements: (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force (by the threatened person) was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of force applied, and (6) the beliefs of the person threatened were objectively reasonable. *People v. Gray*, 2017 IL 120958, ¶ 50 (citing 720 ILCS 5/7-1 (West 2014)).

¶ 25    The State's first argument is that self defense is not available to negate a charge of AUUW because the second amendment allows the State to impose regulations for carrying weapons. According to the State, "the failure to have been issued a currently valid license under the Concealed Carry Act at the time of the offense, means that defendant's reliance upon his right to self defense is not valid as his conduct is not protected by the Second Amendment right to self defense." The State cites no case law in support of this proposition, and it is simply not correct. Claude nowhere asks to be permitted to walk around armed with a firearm without a FOID card or CCL, in derogation of the state's clear power to meaningfully regulate the possession of firearms. See *People v. Aguilar*, 2013 IL 112116, ¶ 21. Rather, he acknowledges that his possession violated the law but argues that his brief, unlawful possession of a handgun was justified because it was necessary to defend himself and his father.

¶ 26    Prior to oral argument, the defense brought to this court's attention the decision in *Harmon v. State*, 849 N.E.2d 726 (Ind. Ct. App. 2006). In that case the Indiana Court of Appeals held that evidence of self defense should have been allowed on a charge of unlawful possession of a firearm by a violent felon. The Indiana court agreed with courts of several other states that

8

the prohibition on a felon possessing a firearm was "not intended to affect his or her right to use a concealable firearm in self-defense," but only "to prohibit members of the affected classes from arming themselves with concealable firearms or having such weapons in their custody or control in circumstances other than those in which the right to use deadly force in self-defense exists or reasonably appears to exist." *Id.* at 734.

¶ 27 There appears to be no Illinois case raising this precise issue, but this court accepted the analogous defense of necessity for an unlawful possession of a gun in *People v. Gullens*, 2017 IL App (3d) 160668. In *Gullens*, we reviewed the revocation of a defendant's conditional discharge for a prior felony conviction after he was found to have been in unlawful possession of a handgun for approximately 10 minutes between discovering that his associate stole it and returning it to its owner. *Id.* ¶¶ 19-25. The defendant had gone to a local gun store with several other people and left without realizing that one of them stole a handgun from the store. *Id.* ¶ 5. Later that day, he learned of the theft and took the handgun from his friend in order to immediately return it. *Id.* ¶ 12. The State argued that as soon as the defendant took the handgun, he committed unlawful possession of a weapon by a felon in violation of the terms of his conditional discharge. *Id.* ¶¶ 7, 24. However, the defendant argued that he was blameless in the circumstances of the theft and that his only reasonable option was to take the stolen gun back to the store because he doubted his friend would do so, and he did not want the gun to be sold or used in a future crime. *Id.* ¶ 23.

¶ 28 We agreed, finding that the defendant in *Gullens* was "without blame in occasioning or developing the situation that resulted in the theft," returning the gun himself was the sole option available, and returning it "undoubtedly promoted a higher value than refraining from being a felon in possession of a weapon for the 10 minutes it took to return the gun to the store." *Id.*

¶ 29    Self defense, defense of another, and necessity are all justification defenses that employ a similar balancing of the circumstances a defendant faced against the actions he took. See 720 ILCS 5/7-1, 7-13 (West 2014); see also *People v. Houser*, 305 Ill. App. 3d 384, 392 (1999) (noting that, although "compulsion and necessity defenses are comprised of different elements," the two "are closely linked, sharing the same factual basis"). For all the reasons that necessity can be raised as a defense to an AAUW charge, so can self defense—which is itself a type of necessity, justifying the use of force when an immediate, greater evil threatens a person who initiated no violence and had no other recourse. The State's right and need to regulate guns does not mean that a criminal defendant cannot raise such a defense to a gun charge.

¶ 30    On the merits of self defense, the State claims that it negated elements (1), (2), and (4)—respectively, that imminent unlawful force was threatened, that Claude was not the aggressor, and that the use of force by Claude was necessary. *Gray*, 2017 IL 120958, ¶ 50. However, in our view, no reasonable trier of fact could have found any of these elements to be missing or that the threat was not imminent. The facts were undisputed that the three men who answered the door pushed the defendant or his father and continued to threaten to use further force by yelling, in reference to Claude, "I will empty the caps in his a**." The evidence is also undisputed that Claude had come to pick up his daughter and his clothes, not to pick a fight. The unrebutted testimony was that Claude and his father were attacked without provocation, 73-year-old Sammie suffered injuries as a result of being knocked off of the porch, and the three men coming out of the house were continuing to threaten them. All of this transpired before Claude reached for the handgun, and none of it was initiated by him. The entire episode took only minutes. Throughout that time, Claude retained a reasonable concern for his and his father's safety.

¶ 31    The record also indicates that Claude saw a bulge under Ra-Ra's shirt that Claude

believed was a weapon. Innumerable cases in the search or seizure context stand for the proposition that such an observation, conveyed through credible and uncontroverted testimony, can give rise to the inference that a person is armed and presents an immediate danger. See, *e.g.*, *People v. Morales*, 221 Ill. App. 3d 13, 18 (1991) (a "characteristic bulge" in the suspect's clothing gave a police officer reason to believe the defendant was armed). Although no handgun was recovered from the scene of the attack, no testimony in the record disputes Claude's account that he believed Ra-Ra was armed.

¶ 32    It is also undisputed that the actions Claude took were reasonably necessary. He faced a genuine dilemma when the men on the porch continued to threaten him and his father. Regardless of whether the men who had attacked him had a gun, he had a legitimate fear of injury to himself and further injury to his father, who was already immobilized with injuries. It was not unreasonable for Claude to leave the scene with the weapon rather than leave it there, where the three aggressors could have used it and where his incapacitated father was neither able to secure it nor use it to defend himself. Claude's conduct after leaving the altercation— manually unloading the handgun and identifying the ejected bullets for the police—reveals that Claude attempted to minimize or eliminate any harm resulting from his continued possession of the weapon. No rational trier of fact could have found that the State negated any element of Claude's claim of self defense, and we find that defense justifies his conduct in this instance.

¶ 33    When this court at oral argument asked the State about the related defense of necessity, as opposed to self defense, the State responded that the necessity defense was likely the "proper situation that would apply to these facts." Necessity does not require the defendant to show any imminent risk of harm. Rather, to establish a defense of necessity, the person claiming the defense (1) must be without blame in occasioning or developing the situation and (2) must have

reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might have reasonably resulted from his own conduct. *Guja*, 2016 IL App (1st) 140046, ¶ 47 (citing 720 ILCS 5/7-13 (West 2014)). This "usually involves the choice between two admitted evils where other optional courses of action are unavailable, and 'the conduct chosen must promote some higher value than the value of literal compliance with the law.' " *People v. Boston*, 2016 IL App (1st) 133497, ¶ 39 (quoting *People v. Janik,* 127 Ill. 2d 390, 399 (1989)). In reference to this defense, the State does not suggest that any element is missing but only that the defense of necessity "was not raised at trial" or in Claude's appellate briefs.

¶ 34    We do not fault the trial court, but since the defendant consistently argued that he had no choice but to grab the gun and since Claude's own use of force was minimal, the trial court might have clarified with trial counsel whether the defense that Claude was asserting was really necessity, more than self defense. We note that in *Gullens*, 2017 IL App (3d) 160668, we recognized a necessity defense for the same kind of crime charged here and that, indeed, necessity might be even more on point than self defense.

¶ 35    In any event, no rational trier of fact could find the State carried its burden with respect to negating either the defense of self defense or the defense of necessity, based on the undisputed evidence presented at trial. We thus reverse Claude's conviction for AUUW. This ruling makes it unnecessary to address Claude's request that we correct his mittimus.

¶ 36                                    IV. CONCLUSION

¶ 37    For the above reasons, we reverse Claude's conviction for AUUW.

¶ 38    Reversed.